████████████████████████████████

███████████████

No. 19-1329C                    **FINAL REDACTED VERSION**
(Judge Wheeler)
**Bid Protest**

---

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

G4S Secure Solutions (USA), Inc.,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

ISS Action, Inc.
Defendant-Intervenor.

---

### PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

---

October 15, 2019

Gerald H. Werfel, Esq. (Attorney of Record)
H. Todd Whay, Esq.
Baker, Cronogue, Tolle & Werfel, LLP
1320 Old Chain Bridge Road, Suite 200
McLean, Virginia 22101
Tel: (202) 448-9677, Ext. 21
Fax: (202) 403-3814
ghwerfel@bctwlaw.com/twhay@bctwlaw.com
Attorneys for Plaintiff

████████████████████████

████████████

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………………………… iv

PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE
RECORD …....…………………….………………………………………… 1

I. STATEMENT OF THE CASE ………………………………………………. 1

   A. Nature of the Case ………………………………………………………. 1

   B. Questions Presented ……………………………………………………… 2

   C. Statement of Facts and Course of Proceeding ………………………………… 2

      1. The Solicitation, the PWS, and the Evaluation Instructions ………………… 2

      2. CBP's Evaluation Plan ……………………………………………….. 10

      3. The Incumbent Contractor – G4S ….…………………………………… 11

      4. The G4S quote – Phase 1 and Phase 2 …………………………………….. 12

      5. The ISS quote – Phase 1 and Phase 2 …………………………………….. 14

      6. CBP's award decision and the Source Selection Decision Document ………. 15

II. STANDARD OF REVIEW ….……………………………………………… 17

III. ARGUMENT ….…………………………………………………….................. 20

   A. The Government failed to follow the terms of the Solicitation in evaluating
quotes and selecting the awardee for the BPA…………...……………………… 20

      1. The Government failed to conduct the required cross-walk for pricing …….. 21

      2. The Government violated the Solicitation's terms for Phase 2 ……………… 22

      3. The Government utilized an unstated evaluation criterion ………………….. 24

   B. The Government treated ISS and G4S unequally ………………………………… 25

   C. The Government failed to reasonably evaluate Factor One during Phase 1 and
thus overlooked the risk posed by ISS as a potential contractor …………….……… 27

D.  The Government unreasonably evaluated the G4S oral presentation ………….  30

1.  The Government unreasonably evaluated G4S for its presentation skills ……..  30

2.  The Government unreasonably evaluated G4S's responses during the Q&A ..  31

E.  The Government failed to adequately document its evaluations ……………..  32

F.  The Government's best value determination is flawed …………………………  34

G.  G4S was prejudiced by the Government's improper evaluations and best value determination ……………………………………………………………………………..  36

H.  All factors favor permanent injunctive relief …………………………………..  36

1.  Success on the Merits …………………………………………………………..  36

2.  G4S will suffer irreparable harm …………………………………………….  37

3.  The harm to G4S outweighs the harm to the Defendants …………………….  38

4.  Injunctive relief is in the public's interest ………………………………………  39

IV.  CONCLUSION …………………………………………………………………….  39

## **TABLE OF AUTHORITIES**

**CASES**                                                                      **PAGE(S)**

*AM General, LLC v. United States*
   115 Fed.Cl. 653, 667 (2014) ………………………………………………...            18, 25

*Antarctic Support Assocs. v. United States*
   46 Fed.Cl. 145, 154 (2000) ………………………………………………….            18

*Axiom Res. Mgmt., Inc. v. United States*
   564 F.3d 1374, 1381 (Fed.Cir. 2009).) …………………………………………            19

*Banknote Corp. of Am., Inc. v. United States*
   56 Fed. Cl. 377, 380 (2003), aff'd, 365 F.3d 1345 (Fed.Cir.2004) ………………            20

*Bannum, Inc. v. United States*
   404 F.3d 1346, 1355-56 (Fed. Cir. 2005) …………………………………………            18, 36

*Bean Stuyvesant, L.L.C. v U.S.*
   48 Fed.Cl. 303, 319 (2000) …………………………………………………..            19

*CHE Consulting, Inc. v. United States*
   552 F.3d 1351, 1354 (Fed. Cir. 2008) ……………………………………………..            19

*Citizens to Preserve Overton Park, Inc. v. Volpe*
   401 U.S. 402, 415-416 (1971) ………………………………………………….            18

*E.W. Bliss Co. v. United States*
   77 F.3d 445, 448 (Fed.Cir.1996) …………………………………………………..            20

*Femme Comp Inc. v. U.S.*
   *83 Fed.Cl. 704, 756 (2008)* …………………………………………………..            6

*Galen Med. Assoc., Inc. v. United States*
   369 F.3d 1324, 1329-31 (Fed Cir. 2004) …………………………………………..            19

*Heritage of Am., LLC, v. United States*
   77 Fed. Cl. 66, 78 (2007) …………………………………………………………            37

*Hospital Klean of Tex., Inc. v. United States*
   65 Fed. Cl. 618, 624 (2005) ………………………………………………..            39

*Hunt Bldg. Co. v. United States*
   61 Fed.Cl. 243, 273 (2004) …………………………………………………………            20

*Impresa Construzioni Geom. Domenico Garufi v. United States*
116 Fed.Cl. 643, 650 (2014) ……………………………………………………… 20

*Keco Industries, Inc. v. United States*
492 F.2d 1200, 1204 (1974) ……………………………………………………….. 19

*Keeton Corrs. Inc., v. United States*
59 Fed. Cl. 753, 755 (2004) ……………………………………………………….. 19

*Linc Government Services, LLC v. United States*
96 Fed. Cl. 672, 705 (2010) ……………………………………………………….. 19

*Magnum Opus Techs. v. United States*
94 Fed. Cl. 512, 551 (2010) ……………………………………………………… 39

*NCL Logistics Company v. United States*
109 Fed.Cl. 596, 626 (2013) ……………………………………………………… 25

*Overstreet Elec. Co. v. United States*
47 Fed. Cl. 728,743-44 (2008) …………………………………………………… 37

*PGBA, LLC v. United States*
57 Fed. Cl. 655, 664 (2003) ……………………………………………………….. 37

*Pitney Bowes Gov't Solutions, Inc. v. United States*
94 Fed.Cl. 1, 15 (2010) …………………………………………………………… 25

*Red River Holdings, LLC v. United States*
87 Fed.Cl. 768, 786 (2009) ……………………………………………………….. 20

*Springfield Parcel C, LLC v. United States*
124 Fed. Cl. 163, 194 (2015) ……………………………………………………… 37

*Tech Sys., Inc. v. United States*
50 Fed. Cl. 216, 222 (2001) ……………………………………………………… 18

*T & S Products, Inc. v. United States*
48 Fed.Cl. 100, 104 (2000) ……………………………………………………… 19

*Transactive Corp. v. United States*
91 F.3d 232, 237 (D.C.Cir.1996) ………………………………………………… 25

████████████████████████████

████████████████

## GAO CASES

*Glasslock, Inc.*
    B-299931, B-299932.2, October 10, 2007, 2007 CPD ¶ 216 ……………………..     25

*Systems Research & Applications Corp.; Booz Allen Hamilton, Inc.*
    B-299818 et al. Sept. 6, 2007, 2008 CPD ¶ 28 at 12 …………………………….     33

*TriCenturion, Inc.; SafeGuard Services, LLC*
    B-406032 et al., Jan. 25, 2012, 2012 CPD ¶ 52 at 13 …………………………….     33

## STATUTES

5 U.S.C. § 706 ………………………………………………………………….     18

28 U.S.C. § 1491(b) …………………………………………………………….     18

## FEDERAL RULES

RCFC 52.1(c) ...………………………………………………………………….     1

## REGULATIONS

FAR 1.602-2(b) ………………………………………………………………….     25

FAR 8.405-2 …………………………………………………………………….     3

FAR 8.405-3(b)(2)(vi) …………………………………………………………...     9

███████████████████████████████████████

████████████████████████████████

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

| | | |
|---|---|---|
| **G4S SECURE SOLUTIONS (USA), INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 19-1329C |
| v. | ) | Hon. Thomas C. Wheeler |
| | ) | |
| **THE UNITED STATES**, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ISS ACTION, INC.** | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff G4S Secure Solutions (USA), Inc. (hereinafter "G4S," the "Company" or the "Plaintiff"), respectfully files this Motion for Judgment upon the Administrative Record ("MJAR") and moves that the Court grant judgment upon the administrative record in favor of G4S.

## I.    STATEMENT OF THE CASE

**A.    NATURE OF THE CASE.**

In this post-award protest, G4S challenges (i) the evaluation of quotes submitted in response to RFQ No. 03C19Q0067 (hereinafter the "RFQ" or the "Solicitation), (ii) the non-selection of the Company's offer in response to the RFQ and (iii) the decision by U.S. Customs

1

██████████████████████████████████████████████

████████████████████████████████

and Border Protection ("CBP" or the "Government") to enter into a Blanket Purchase Agreement ("BPA") with ISS Action, Inc. ("ISS") under which orders are to be placed for transportation services in support of work performed by CBP along the Southwest Border of the United States G4S seeks declaratory, injunctive, and other relief from a series of improper actions on the part of CBP. Those improper actions have resulted in award to a contractor with no experience in providing the required transportation services at a price that fails to take into account the scope and complexity of those services, and was made without due consideration of the risks associated with such a decision. As discussed below, CBP's evaluation of offers from G4S and ISS was inconsistent with the terms of the Solicitation, and the conclusions reached by CBP are unsupported by the administrative record in this case. The evaluation of quotes and the resulting award decision were arbitrary, capricious, and violated the terms of the Solicitation, as well as applicable law.

**B.**     **QUESTIONS PRESENTED.**

**1.**     Was CBP's evaluation of proposals submitted in response to the Solicitation arbitrary, capricious, or contrary to law or procurement regulations?

**2.**     Was CBP's decision to place a BPA with ISS under which orders valued in excess of $275,000,000 are contemplated, arbitrary, capricious, or contrary to law or procurement regulations?

**C.**     **STATEMENT OF FACTS AND COURSE OF PROCEEDING.**

**1.**     **The Solicitation, the PWS, and the Evaluation Instructions.**

CBP issued the Solicitation on June 25, 2019, seeking offers for "an anticipated requirement for Transportation and Security Guard Services in support of the US Border Patrol, along the Southwest Border." AR at 1. The RFQ advised that CBP intended to conduct the

███████████████████████████████████████████

██████████████████████████████████

procurement under the procedures at "FAR[1] Part 8.405-2(b)(2)[2]." Offerors were told that CBP planned to "enter into a single Blanket Purchase Agreement (BPA) with a General Services Administration (GSA) Federal Supply Schedule (FSS) vendor . . ." that would have a period of performance consisting of "a one (1) year base period and four (4) option year periods." AR at 1, 78. Competition for the BPA was limited to contractors holding a current Schedule 84 contract which included pricing for Special Item Number ("SIN") 246-54[3]. *See* AR at 2.

The RFQ[4] consisted of a cover letter from the Contracting Officer dated June 25, 2019, and six (6) attachments – (i) Evaluation Instructions; (ii) a Corporate Experience Questionnaire ("CEQ"); (iii) a Performance Work Statement/Transportation Plan; (iv) Pricing Worksheet/Sample Task Order[5]; (v) a Quality Assurance Surveillance Plan and (vi) a BPA template. *See* AR at 1.

The contractor selected to receive the BPA was to support mission performance by CBP, which as described in the Performance Work Statement ("PWS"), Attachment 3 to the RFQ,

> … is responsible for the detection and apprehension of individuals who are inadmissible or who attempt to unlawfully enter the U.S.; stemming the flow of drugs and other contraband; protecting our agricultural and economic interests from harmful pests and diseases; protecting American business from theft of their intellectual property; and regulating and facilitating international trade, collecting import duties, and enforcing U.S. trade laws.

AR at 49. As noted in the PWS, "the majority of all apprehensions occur within the CBP

---

[1] Federal Acquisition Regulation.

[2] This citation appears to be in error. There is no "FAR 8.405-2(b)(2)" in the FAR. We have assumed that CBP meant to make reference to FAR 8.405-2 which is entitled "Ordering procedures for services requiring a statement of work."

[3] SIN 246 54 is titled "Protective Service Occupations."

[4] Unless otherwise indicated, references to the RFQ are intended to refer to the June 25th cover letter together with the six (6) attachments identified in the cover letter.

[5] Attachment 4 to the RFQ was not included as a separate stand-alone document with the AR. When referring to the Pricing Worksheet and the Sample Task Order in this MJAR, we will cite to the Pricing Worksheets and Sample Task Orders which are a part of CBP's Price Analysis Report, AR, pages 269-279.

████████████████████████████████████

Southwest Border ("SWB") Sectors and Field Offices, which average 1,689 detainees per day that require transportation and guard services."  AR at 49.

The offeror selected for award of the BPA was to:

> . . . provide performance-based transportation and facilities guard services. Transportation services will include escort, guard, and transport services for detainees in DHS custody. CBP defines a detainee as any person regardless of citizenship or nationality who is detained by CBP or any other law enforcement agency.  The scope of this contract does not include transportation of violent prisoners.  Transportation services will also entail over-the-road transport services in vehicles of sufficient capacity to meet the performance standards, courtroom transportation, detention facility booking transportation, security services and other related transportation and guard duties. The facilities guard services include escort and guard services of detainees in DHS custody while at a medical treatment facility, courtrooms, detention facilities, and provide security back-up to transportation officer in a vehicle and other guard services as directed by the Contracting Officer's Representative (COR) or a Task Order Monitor (TOM) designated by the Contracting Officer (CO).

AR at 49.

The PWS goes on to explain that,

> The required services supporting CBP will be performed in the nine Border Patrol sectors of San Diego, El Centro, Yuma, Tucson, El Paso, Big Bend, Del Rio, Laredo and Rio Grande Valley and within their areas of responsibility to include Border Patrol stations, Field Offices, Ports of Entry, highway checkpoints, processing centers, hospitals, courts, and detention centers.  Services include over-the-road transportation and guarding of foreign nationals (males, females, minors and Unaccompanied Alien Children (UAC)).

AR at 50.

Workload estimates were provided as an appendix to the PWS.  AR at 81.  The tables provided in Appendix A – "Operational Availability Hours for CBP Mission Support Base," showed hours for "estimated weekly required vehicle transport capacity, vehicle operational hours for both Transportation Officers and Facility Guard Officers" by sector and field office.  AR at 81.

The Evaluation Instructions informed offerors that CBP would "conduct a streamlined

████████████████████████████████████

    ████████████████████████████████

evaluation of FSS contractors currently holding GSA contracts for establishing a BPA."  AR at 2.
Offerors were told that the procurement would be conducted in two phases:  Phase 1 was a phone
interview, and for those offerors down-selected to go forward to Phase 2, there were to be oral
presentations.  *See* AR at 2.   To participate in Phase 1, an offeror was required to request a phone
interview and submit a completed CEQ by July 10, 2019.  *See* AR at 2.  There was no written
technical volume for Phase 2, and offerors were advised that "[n]o written technical volume of any
sort will be accepted."  AR at 2.  "The only required written submittal for Phase 2 will be the
Pricing Worksheet and the Sample Task Order submission."  AR at 2.

        The Evaluation Instructions promised offerors that the BPA would be established "with the
schedule contractor whose quote is determined to best meet the needs of the Government after
consideration of all factors – i.e. provides the 'best value.'"  AR at 9.  "'Best value' is defined here
as the procurement process that results in the most advantageous acquisition decision for the
Government and is performed through an integrated assessment and trade-off analysis among price
and non-price factors."  AR at 9.   Further, "[t]he basis for the establishment of a BPA as a result
of the RFQ will be a detailed, integrated evaluation by the Government on the basis of how well
the presentations satisfy the evaluation criteria in the provision entitled 'Evaluation Criteria[6]' in
this solicitation."

        The Evaluation Instructions continue by making clear that award of a BPA can only be
made to a vendor:

        1.  Whose technical presentation and pricing represents the best value; and
        2.  Whose proposed price is determined to be fair and reasonable.

---

[6]  The section of the RFQ entitled "Evaluation Criteria" can be found at AR, pages 10 -11.

██████████████████████████████████████

       ████████████████████████████

AR at 9.  In this connection, offerors were told that "[t]he Government will perform a cross-walk[7] of the technical presentation and pricing submission to ensure the price approach is consistent with the technical approach."  AR at 9.  "This cross-walk will affirm that the vendor's price is fair and reasonable with respect to the vendor's technical approach (i.e. level-of-effort/labor mix)."  AR at 9-10.

       The Evaluation Instructions identified three factors for determining "best value" - Factor 1: Experience and Risk Awareness/Mitigation; Factor 2: Oral Presentation; and Factor 3: Pricing Spreadsheet and Sample Task Order Submission.   *See* AR at 9.  Offerors were told to "note that Phase 1 evaluation criteria are more important than Phase 2 evaluation criteria."  AR at 3.  They were also told that the two "non-price/cost" factors were "significantly more important than Cost/Price." AR at 9.  "The Government is more concerned with obtaining superior technical performance capability . . . than with making an award at the lowest overall evaluated cost/price." AR at 9.

       For Factors 1 and 2, offerors were to be rated as High Confidence, Some Confidence, or Low Confidence.  *See* AR at 10.  The ratings were defined as follows:

| Rating System for Evaluation of Technical (Non Price) Factors | |
| --- | --- |
| **High Confidence** | The Government has *high confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with little or no Government intervention. |
| **Some Confidence** | The Government has *some confidence* that the Offeror understands the requirement, proposes a sound approach, and will be successful in performing the contract with some Government intervention. |
| **Low Confidence** | The Government has *low confidence* that the Offeror understands the requirement, proposes a sound approach, or will be successful in performing the contract even with Government intervention. |

---

[7]  While not defined in the RFQ, a cross-walk in the context of this procurement s generally understood to mean a comparison "of the proposed labor rates and the awardees' Corporate Capability and Technical/Management volumes . . ." *Femme Comp Inc. v. U.S.*, 83 Fed.Cl. 704, 756 (2008).

███████████████████████████████████

██████████████████████████████

AR at 10.  For the Factor 1 evaluation, offerors were required to complete and submit the CEQ "[b]y the date and time set in this RFQ for Phase 1."  AR at 3.  The CEQ was to identify a maximum of three "ongoing projects or projects completed within the last three (3) years of the date of this RFQ."  AR at 12.  CEQs were supposed to demonstrate the offeror's "relevant experience performing projects similar in size, scope, and complexity to this BPA requirement."  AR at 12. If an offeror was submitting its quote as part of a Contractor Teaming Arrangement ("CTA"), at least two of the projects were required to be "from the prime schedule contractor's own experience and no more than one may be a CTA partner's experience."  AR at 3.

The Factor 1 evaluation – Phase 1 of the procurement – was to be conducted through a telephone interview.  *See* AR at 2.  Contractor participation in the telephone call was limited to three persons that were then current employees of the prime schedule contractor.  *See* AR at 3.

> In the phone call, the quoter shall identify a maximum of three (3) past contracts/orders that are most similar in size (i.e. the # of estimated FTEs performing the requirement and/or the estimated dollar value of the contract) and scope to the work of this RFQ.  For each of these, the quoter shall describe (A) its own experiences in providing similar services in circumstances similar to CBP's, (B) the similarities and the differences, (C) the value it brought to those experiences, (D) its lessons learned from those experiences, (E) the value to the Government that comes with its experiences, (F) the risks both the Government and the Contractor will face in accomplishing the work and achieving successful task order performance, and (G) its approach to managing those risks as our contractor so that the CBP Ground Transportation and Guard services effort will be successful.

AR at 3.  The Evaluation Instructions provided that "[b]ased on its evaluation of Factor One, the Government intends to advise up to three schedule contractors who are most highly rated for Factor 1 (based on the confidence rating system described in section I.7[8]) to proceed to Phase 2." AR at 3.

---

[8]  We believe CBP intended to reference §I.5 of the Evaluation Instructions and not §1.7.

The oral presentations, Phase 2 of the evaluation process, relate to Factor 2, Technical/Management Approach. *See* AR at 3. Offerors selected to participate in Phase 2 of the evaluation were required to make an oral presentation. AR at 3-4. In addition,

> By the date and time set in the Phase 1 notice for receipt of Phase 2 quotations, the quoter shall submit (A) a one-page document that summarizes the points it intends to make in its oral presentation, (B) a list of attendees at the oral presentation (including name, employer, title, proposed role in performance, and citizenship).

AR at 4.

For the oral presentations, offerors were limited to five attendees. *See* AR at 4. Offerors were told that "[t]he attendees must include the proposed program manager, a proposed sector manager, and a proposed transportation officer." AR at 4. The RFQ specifically prohibited offerors from utilizing professional presenters. *See* AR at 7.

During the briefing portion of the oral presentation, offerors were to be given up to two hours to provide its presentation and answer the following five questions:

- Question 1: Summarize your approach to fulfill the requirements outlined in the PWS (if presenting under a CTA, quoters shall summarize the CTA structure and explain how the agreement will allocate work under the PWS tasks.

- Question 2: Outline the challenges you expect to encounter with the PWS requirements.

- Question 3: Describe how you plan to ensure that the Operational Requirement of 95% will be consistently met.

- Question 4: Describe your plan to provide the required vehicles for the sectors, and how you intend to ensure they are always available per the PWS.

- How do you plan to ensure adequate numbers of trained and qualified Transportation/Detention Officers, including BI's both initially, and throughout the contract?

AR at 4-6. Offerors were also told that they would have no more than thirty minutes to answer the so-called "challenge" questions presented during the Q&A session that followed the briefing

portion of the oral presentation.  AR at 6.  In this connection, the Evaluation Instructions provided:

> After completion of the Oral Presentation, the Government evaluation team members shall have the opportunity to ask questions in order to clarify any points addressed which are unclear and may ask for elaboration from the presenters on any topics addressed in the Oral Presentation.

AR 8.  "At the conclusion of the Oral Presentation, Vendors will be asked to submit their written Price quote which consists of the Pricing Worksheet (Excel spreadsheet) and the Sample Task Order for Factor 3 (Price). [See Attachment 4]".  AR at 8.  The oral presentations were to be evaluated immediately after they occurred.  *See* AR at 4.

The evaluation of price, Factor 3, was to be separate and apart from the evaluation of the two non-price/cost factors.  *See* AR at 10.  CBP said that it would be conducting a price analysis "to determine fairness and reasonableness in accordance with FAR 8.405-3(b)(2)(vi) and if proposed prices accurately and adequately reflect the work to be performed."  AR at 10.  In addition,

> The Offeror's proposed price will also be considered in the context of price risk and affordability.  In this context, price risk is the Government's level of confidence in the Offeror's ability to perform the work as proposed based on the following:
>
> 1.  The price information provided by the Offeror and/or from the applicable GSA schedule
> 2.  The completeness of the Offeror's price documentation proposed in the Excel spreadsheet entitled "Pricing Schedule"[9].
> 3.  The completeness of the Offeror's pricing in response to the Sample Task Order

AR at 10-11.

The Pricing Worksheets that were to be submitted at the conclusion of oral presentations required offerors to input data into an Excel spreadsheet provided by CBP.  *See* AR at 5.  The

---

[9]  We have assumed that this reference to a "Pricing Schedule" was actually meant to be a reference to the "Pricing Worksheet," Attachment 4 to the RFQ.

█████████████████████████████████████████

███████████████████████████████████

spreadsheet called for separate pricing by Contract Line Item Number ("CLIN") for the resources (labor and vehicles) necessary to satisfy (1) the performance requirements specified in the PWS and (2) surge requirements.  *See* AR at 271.  Pricing was required for a base year, 4 one-year option periods, and a six-month extension period[10], broken-down by nine individual "sectors" along the Southwest Border where transportation services were to be provided.  *See* AR at 271.  Offerors were instructed to populate only those cells in the spreadsheet  highlighted in yellow.  *See* AR at 271.  Those yellow cells required input for (1) the number of transportation/detention officers, the number of supervisors, and hourly rates for all labor, and (2) the number of vehicles, by type, for transporting detainees and hourly rates for the vehicles, by type.  *See* AR at 271.  In addition to the Pricing Worksheet, offerors were required to price a "Sample Task Order for Surge Support."  *See* AR at 273.

Using the information in the Pricing Worksheet, CBP was to determine a "bottom line price" for each offeror,

> . . . by combining the bottom line price for all CLINs including the NTE amounts for (Travel-Direct Reimbursable) and fuel.  The equivalent CLINs in each of the Option periods will be combined to develop a bottom line price for each of the Option Periods.  The Government will then combine the bottom line price of the base period and the bottom line price of each of the option periods to determine a total evaluated price.

AR at 11.

## 2.    CBP's Evaluation Plan.

CBP prepared an "Evaluation Plan" which describes the process that would be used to determine the winner for the competition for the BPA.  AR at 123-124.  CBP also prepared a

---

[10]   Pricing for a six-month extension was required in addition to base and option years pricing, even though the RFQ advised that the period of performance was for a base year and 4 one-year option periods.

████████████████████████████████████████████
██████████████████████████████████████

document entitled "Source Selection Forms and Process for the CBP Transportation Program," which provides additional detail about the source selection process. AR at 108-122.

The Forms and Process document specified that source selection would "be done in two phases . . ." AR at 110. The document identified the roles and responsibilities of the various groups and individuals that would be involved in evaluating offers and choosing a winner. *See* AR at 110-111. These groups included a Technical Evaluation Team ("TET"), a Price Evaluation Team ("PET"), and a Source Selection Evaluation Board ("SSEB"). *See* AR at 110-111. The TET was to evaluate the Phase 1 phone interviews and the Phase 2 oral presentations (*see* AR at 110) and the PET was to "evaluate pricing for reasonableness" (AR at 110). The SSEB and the Source Selection Authority ("SSA") were to be briefed on the evaluations conducted by the TET and the PET, and the SSA was to "select the winning offeror." AR at 110.

### 3. The incumbent contractor - G4S.

G4S is the incumbent contractor for the services to be provided under the BPA award contemplated by the RFQ. *See* AR at 97, 1126. The Company has been providing those services continuously for the last thirteen years. *See* AR at 283. As part of its incumbent contract, CBP has approved the Company's existing management plan and standard operating procedures ("SOPs"). The Company's approved SOPs include the following provisions:





*See* Pl. Comp.[11] at ¶34.

### 4.    The G4S quote – Phase 1 and Phase 2.

G4S requested a Phase 1 interview by July 10, 2019, "the due date for initial responses to the RFQ." AR at 282. As noted above, the Phase 1 telephone call with G4S took place on July 18, 2019. AR at 282. In connection with the call and as required by the RFQ, G4S provided CBP with a CEQ which identified three (3) projects "which demonstrate(d) the firm's . . . prior experience performing work similar to that required by the PWS . . ." AR at 97. Work on these projects were under contracts performed by and awarded to G4S. *See* AR at 96-98. ████████

████████████████████████████████████████████

████████████████████████ *See* AR at 97. A second contract identified by G4S was with ████████████████████████████

████████████████████ *See* AR at 98. The projected value of that contract over ████████████████████████████. *See* AR at 98.

Based on the telephone interview, the TET concluded that it had ████████████

████████████████████████████ AR at 127. The TET noted that

---

[11] Plaintiff's Complaint.



G4S ████████████████████████████████████████████

██████████. AR at 127.  The TET also noted that ████████████

████████████████████████████████████████████████████

████████████ AR at 127.

CBP wrote to G4S on July 18, 2019, to advise that based on the Phase 1 evaluation, the Company was being invited to participate in Phase 2, the oral presentation.  *See* AR at 125.  G4S was told to provide a one-page document summarizing the points that the Company planned to make at the oral presentation and a list of attendees by July 26, 2019.  *See* AR at 125.

The G4S oral presentation took place as scheduled on July 30, 2019.  *See* AR at 155-171. As required by CBP, G4S provided a one-page summary of the points it planned to make in response to the five questions detailed in the Evaluation Instructions (*see* AR at 136), as well as a list of attendees (*see* AR at 136-138).

G4S's oral presentation was presented by –



*See* AR at 136-138.

As permitted by the RFQ, G4S presenters utilized notes during their presentations to ensure they covered each of the five questions that had been identified in the RFQ.  *See* AR at 986. Moreover, ████████████ asked the contracting officer, Mr. Saad, before the oral presentation if it was acceptable for the G4S presenters to utilize notes.  *See* Pl. Comp. at ¶45.  The contracting officer confirmed that the use of notes was acceptable.  *See* Pl. Comp. at ¶45.  The presenters did not read verbatim from the notes, but merely referenced the notes during the presentation.  *See* Pl.

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

Comp. at ¶45.  According to the transcript of the oral presentation provided by the Government as part of the Administrative Record, the G4S presenters took one hour to provide their briefing, during which they responded to the initial set of five questions.

After the oral presentation was concluded, the CBP attendees met by themselves and returned with a series of "challenge" questions for the Question & Answer ("Q&A") session:



According to the transcript, asking and responding to the G4S challenge questions during the Q&A session took seven minutes and forty-six seconds of the allotted thirty minutes.  AR at 171.  At no point did any of the CBP officials present indicate that the answers by G4S were incomplete, confusing, or otherwise lacking in responding to the questions posed by the TET.

**5.     The ISS quote – Phase 1 and Phase 2.**

ISS also requested a Phase 1 interview by July 10, 2019, "the due date for initial responses to the RFQ." AR at 282.  The Phase 1 telephone call with ISS took place on the same day as CBP's call with G4S - July 18, 2019.  AR at 282.  Prior to the phone interview, ISS provided CBP with a CEQ which identified three projects.  AR at 99-107.  ████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████     ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

---
[12] Task Order Manager.

████████████████████████████████████████████████████████
████████████████████████████████████████████████

After the phone interview, ISS was asked to participate in Phase 2 of the procurement. *See*

AR at 130. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

AR at 132. The members of the TET decided that ████████████████████████████

████████████████████████████████████████████████████" AR at 132.

██  ████████████████████████████████████
    ████████████████████████████████████████
██  ██████████████████████████████████████████
    ██████████████████████████████████████████
    ████████████
██  ██ ██████ ████ ████ ████ ████ ████ ██ ██ ████
    ██████████████████████████████
██  ██████████████████████████████████████
    ██████████████████████████████████
██  ██████████████████████████████████████
    ████████████████████████

AR at 132.

The ISS oral presentation took place as scheduled on July 31, 2019. *See* AR at __. In advance of the oral presentation, ISS provided a one-page summary of the points it planned to make in response to the five questions detailed in the Evaluation Instructions (*see* AR at 139), as well as a list of attendees (*see* AR at 140). ████████████████████████████████

████████████████████████████████████████████. *See* AR at 140.

According to the transcript provided by the Government, the initial portion of ISS's oral presentation – responding to the five questions identified in the RFQ – lasted for approximately sixty-five (66) minutes. See AR at 216. During the next portion of its oral presentation, ISS took "exactly an hour" to respond to a total of seven challenge questions posed by the Government. AR at 251.

15

██████████████████████████████████████
████████████████████████████

**6.      CBP's award decision and the Source Selection Decision Document**

By letter dated August 16, 2019, the Government informed G4S that its quote had not been selected for award, and that award was made to ISS Action, Inc., the only other offeror in response to the RFQ down-selected for Phase 2 of the evaluation.  AR at 322.  The total estimated value of the award to ISS was stated as $277,100,000.00.  AR at 322.  By letter received by G4S on August 16, 2019, CBP provided a "brief explanation of the basis of award" to ISS.  *See* AR at 323-326.

CBP's justification for the award to ISS is detailed in the Source Selection Decision Document ("SSDD").  *See* AR 280-288.  The SSDD identified the following ratings for the two offerors:

| **Factor** | **ISS** | **G4S** |
|---|---|---|
| 1. Experience and Risk Awareness/ Mitigation | ████████████ | ████████████ |
| 2. Technical/Management Approach | ████████████ | ████████████ |

AR at 287.

Regarding G4S's Phase 1 telephone interview, the SSDD highlighted the following findings of the TET:



For G4S's Phase 2 oral presentation and Q&A, the SSDD highlighted the following findings of the TET:



The SSDD indicated that because G4S received a ▓▓▓▓▓▓▓▓▓▓▓ for Factor 2, and ISS received a ▓▓▓▓▓▓▓▓▓ for the factor, the G4S offer represented ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ AR at 288.  In contrast,

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓

AR at 287.  According to the SSDD, the SSA found the pricing of G4S and ISS to ▓▓▓▓▓ ▓▓▓▓▓▓▓▓s to the Government, with ISS's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ than G4S's quote.  AR at 288.

## II.    <u>STANDARD OF REVIEW</u>

The standards applicable to a motion for judgment upon the administrative record differ from those applied in the context of a Rule 56 motion for summary judgment.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005).  The standard applicable to a motion for

judgment upon the administrative record is whether, based upon the disputed and undisputed facts in the AR, the plaintiff has met its burden of proof that the agency's decision was arbitrary, capricious, or contrary to law or procurement regulations. *Tech Sys., Inc. v. United States*, 50 Fed. Cl. 216, 222 (2001).

This Court's review of an agency decision regarding a solicitation or contract award is governed by the standard of review applicable to the Administrative Procedures Act, 5 U.S.C. §706. *See* 28 U.S.C. § 1491(b)(4). In resolving bid protests, this Court "is required to engage in a 'searching and careful' inquiry into the facts without substituting its judgment for that of the agency." *AM General, LLC v. United States*, 115 Fed.Cl. 653, 667 (2014) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "While an agency is allowed a presumption of regularity, 'that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review' … [to] consider whether the agency's evaluation comported with the solicitation criteria and federal procurement law." *Id.* at 668. This Court must conduct a "thorough, probing, in-depth review of the agency's action to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Antarctic Support Assocs. v. United States*, 46 Fed.Cl. 145, 154 (2000) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-416 (1971)).

The standard of review applicable to this protest is whether the agency decision "is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 28 U.S.C. § 1491(b). This Court considers four factors to determine whether an agency's actions were arbitrary or capricious –

>   (i) whether there was subjective bad faith on the part of the procurement officials;

>   (ii) whether the procurement decision had a reasonable basis;

>   (iii) whether the procuring officials abused their discretion; and

(iv) whether the procuring officials violated pertinent statutes or regulations.

*Bean Stuyvesant, L.L.C. v U.S.*, 48 Fed.Cl. 303, 319 (2000). "A protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence." *T & S Products, Inc. v. United States*, 48 Fed.Cl. 100, 104 (2000). A plaintiff bears a "heavy burden" to show that an agency acted improperly. *Linc Government Services, LLC v. United States*, 96 Fed. Cl. 672, 705 (2010).

When applying these standards, this Court determines whether the agency has explained its action and whether the plaintiff has demonstrated a clear violation of a statute or regulation. As the Federal Circuit has noted: "A court evaluating a challenge on the first ground must determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed.Cir. 2009)(internal citations omitted).

This Court is not to substitute its judgment for the judgment of the agency. *Keeton Corrs. Inc., v. United States,* 59 Fed. Cl. 753, 755 (2004). An agency's procurement decisions are subject to a "highly deferential rational basis review." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). The degree of proof of an error that is required of a protester is related to the degree of discretion afforded the procurement official. *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1204 (1974). A procurement official is afforded greater discretion in negotiated procurements, as compared to sealed bid procurements. *Galen Med. Assocs., Inc.*, 369 F.3d at 1330. Moreover, an even greater degree of discretion is afforded to procurement officials for "best value" procurements. *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), aff'd, 365 F.3d 1345 (Fed.Cir.2004).

███████████████████████████████████████
████████████████████████████████

### III.    ARGUMENT

In this case, the Government committed numerous errors in its evaluation of the G4S and ISS quotes.  As discussed below, CBP, among other things, failed to follow the terms of the Solicitation, unreasonably allowed ISS to proceed from Phase 1 of the procurement to Phase 2, improperly and inadequately evaluated the risk posed by the ISS quote, erroneously evaluated the G4S offer, and apparently lacks proper documentation to support its selection of ISS for the BPA. These errors clearly demonstrate improper action on the part of CBP, justifying the relief being requested by Plaintiff.

### A.    THE GOVERNMENT FAILED TO FOLLOW THE TERMS OF THE SOLICITATION IN EVALUATING PROPOSALS AND SELECTING THE AWARDEE FOR THE BPA.

An agency must act reasonably when it evaluates proposals.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed.Cir.2001).  "In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed.Cir.1996).  "It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation."  *Red River Holdings, LLC v. United States*, 87 Fed.Cl. 768, 786 (2009).  An agency's failure to follow its own evaluation scheme is "a prejudicial violation of a procurement procedure established for the benefit of offerors."  *Hunt Bldg. Co. v. United States*, 61 Fed.Cl. 243, 273 (2004).

As discussed below, the Government committed multiple violations of the terms of the Solicitation.  Thus, CBP's evaluations of the G4S and ISS offers were arbitrary, capricious, and otherwise not in accordance with law

██████████████████████████████████████████

███████████████████████████████████

### 1.    The Government failed to conduct the required cross-walk for pricing.

The Solicitation required the Government to conduct a "cross-walk of the technical presentation and pricing submissions to ensure the price approach is in line with the technical approach." AR at 9. In the SSDD, the SSA stated that –

> The Solicitation further advised that the Government would perform a cross-walk of the technical presentation and pricing submissions to ensure the price approach is in line with the technical approach. The cross-walk will affirm the vendor's price is fair and reasonable with respect to the vendor's technical approach (i.e. level-of-effort/labor mix).

*    *    *

> After all initial technical evaluations were completed, the Source Selection Evaluation Board (SSEB) evaluated the vendor's Pricing Worksheets and Sample Task Orders for price reasonableness, inclusive of a cross-walk of the price with respect to the vendor's technical approach.

AR at 281, 285.

Although the Solicitation required the Government to perform a cross-walk of each offeror's pricing to its proposed technical solution and the SSDD makes reference to such a cross-walk, the AR does not include a record of a cross-walk for either the ISS quote or the quote from G4S[13]. The cross-walk was the required methodology for the Government to ensure that the pricing being offered was consistent with the proposed technical solution. Without performing a cross-walk, the Government was unable to determine the risk associated with a particular technical solution because the proposed pricing may not support or be sufficient for the proposed technical solution. Without the required cross-walk, CBP could not rationally compare the risks presented by ISS's offer to the offer from G4S.

For instance, in the absence of a documented cross-walk, there is no record of how or if

---

[13]    We have been informed by counsel for the Government that the SSEB did not prepare any kind of written report on its findings, conclusions or recommendations, but merely provided an oral briefing to the SSA.

████████████████████████████████████████████████████████████

████████████████████████████████████████████

consideration was given to the significant difference in ████████████████ proposed by

each offeror.  As the incumbent contractor with knowledge of the effort required to perform the

work, G4S proposed a ██████████████████████████ identified in the RFQ, with

the ██████████████ ██████████████████████████. AR at 271.  In

contrast, ISS, a company that has never performed this work or managed a contract of this scale,

proposed a ██████████████████████, ████████████████████████████

██████████████████████.  AR at 274.  For example, G4S proposed ████████████

██████████████████████████ with an estimated workload of 8,160 hours, while

ISS proposed ████████████ ████████████. *See* AR at 271, 275.  The weekly hours for

the sectors ranged from 252 hours up to 8,160 hours.  *See* AR at 271. ████████████████

████████████████████████████████████████ Conversely, G4S's proposed

██████████████████ is reflective of the ████████████████████.  The Government has

offered  no  analysis  or  rationale  regarding  (i)  the  value  or  necessity  of  having  ████████████

██████████ to accomplish the proposed technical solutions; (ii) the performance risk associated

with having ████████████████ and failing to allocate ████████████ ████████████

██████████████, or (iii) how the ██████████████████ performing the work for G4S can safely

be ██████████████ [14]

## 2. The Government violated the Solicitation's terms for Phase 2.

Offerors passing Phase 1 of procurement were invited to participate in Phase 2 (*see* AR at

3) which consisted of an oral presentation regarding the offeror's technical and management

approach and a series of challenge questions (*see* AR at 3-4).  The Solicitation included a detailed

---

[14] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

       ████████████████████████████████

process and time limits for oral presentations. The Solicitation provided for a total of four hours

for oral presentations. AR at 5. The four hours were divided as follows:

| Hour | Activity |
|------|----------|
| 1st | Presenting team arrives, introductions, contracting officer (CO) gives questions, Government staff depart the room and presenting team prepares its responses. |
| 2nd/3rd | Government staff returns, presenting team makes its presentation. |
| 4th | Government staff retires to a caucus to see if any further questions need to be asked (1/2 hour); if so, presenting team answers them (1/2 hour). |

AR at 5. As shown above, any follow-up questions during the Q&A session, *i.e.* challenge

questions[15], were limited to the final thirty minutes of oral presentations. Furthermore, the

Solicitation explicitly states that the challenge question period "shall not exceed 30 minutes" and

that any "[u]nused time for the briefing cannot be applied to achieve a longer Q&A session." AR

at 7.

    The total duration of G4S's Q&A session was under 8 minutes. AR at 169-171. For ISS,

its Q&A session took over an hour – more than double the 30-minute limit set forth in the

Solicitation. AR at 235-253. By allowing ISS to greatly exceed the applicable time limit, the

Government violated the Solicitation and provided ISS an unfair advantage during the

procurement. Furthermore, as discussed below, in treating the offerors unequally, the Government

utilized less than 8 minutes of G4S's allotted 30 minutes (only 27%), while failing to ask follow-

up questions to G4S to clarify any outstanding issues.

    **3.    The Government utilized an unstated evaluation criterion.**

    For the oral presentation, the Solicitation forbade offerors from utilizing "marketing reps,

proposal consultants … and professional presenters." AR at 7. In addition, the RFQ required

---

[15] The terms "Q&A session" and "challenge questions" are used interchangeably in the AR.

██████████████████████████████████████████████████

████████████████████████████████

presenters to include an offeror's proposed program manager, the proposed sector manager, and the proposed transportation officer. *See* AR at 4. Offerors were advised that they could not "access phones, computers, or other electronic devices during the oral presentation." AR at 4.

The Solicitation did not address or prohibit offerors from utilizing notes, nor were offerors advised that they would be graded upon the use of notes. Moreover, ████████████████, G4S's ██████████████████████, asked Contracting Officer Saad before the oral presentation if it was acceptable for the G4S presenters to utilize notes. *See* Pl. Comp. at ¶45. Contracting Officer Saad confirmed that the use of notes was acceptable to ████████████. *See* Pl. Comp. at ¶45. Contracting Officer Saad, who was a member of the SSEB, also confirmed in an e-mail to ISS that utilizing notes was acceptable. AR at 986. Contracting Officer Saad informed ISS that –

> I don't see any issue with the presenters bringing and utilizing notes (e.g., an outline) to guide themselves through their oral presentations. However, the notes will not be accepted for consideration in the technical evaluation and the only written submissions that will be accepted for evaluation are the required Pricing Worksheet and Sample Task Order.

AR at 986. Both offerors utilized notes during their presentations. *See* AR at 266 (ISS utilized "very few notes.").

Despite Contracting Officer Saad's confirmation that notes were acceptable, the Solicitation being silent regarding any restriction or reference to the use of notes during oral presentations, and the Government's prohibition on utilizing professional presenters, the Government nevertheless penalized G4S for utilizing notes. *See* AR at 181. The CBP evaluators stated –

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████

██████████████████████████████████████████████

    ████████████████████████████████████████

AR at 181.  CBP acted contrary to the terms and purpose[16] of the Solicitation, as well as the express instructions provided by Contracting Officer Saad, when the use of notes during oral presentations.became an unstated evaluation criterion

## B.    THE GOVERNMENT TREATED ISS AND G4S UNEQUALLY.

Fair and equitable treatment of all offerors is a fundamental requirement of the U.S. procurement system.  *See Glasslock, Inc.*, B-299931, B-299932.2, October 10, 2007, 2007 CPD ¶ 216 ("It is a fundamental principle of government procurement that competition must be conducted on an equal basis, this is, offerors must be treated equally …").  FAR 1.602-2(b) requires contracting officers to "[e]nsure that contractors receive impartial, fair, and equitable treatment."

As observed by this Court, an agency's actions –

> … must comply with the "fundamental principle of federal procurement law that a contracting agency must treat all offerors equally and evaluate their proposals evenhandedly against the solicitation's requirements and evaluation criteria."

*AM General, LLC v. United States*, 115 Fed.Cl. 653, 668 (2014)(citing *Pitney Bowes Gov't Solutions, Inc. v. United States,* 94 Fed.Cl. 1, 15 (2010)).  "An agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."  *NCL Logistics Company v. United States*, 109 Fed.Cl. 596, 626 (2013)(citing *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C.Cir.1996)).

Here, the Government failed to treat G4S fairly and equally during the Q&A session.  First, as discussed above, ISS's Q&A session grossly exceeded the 30-minute time limit, thus, allowing ISS unpermitted time to provide additional information to the Government.  Allowing extra time is akin to the Government accepting a late proposal (*i.e.*, allowing an offeror more time to prepare and submit its proposal than permitted by the solicitation), or allowing an offeror to exceed page

---

[16]  The purpose of the Solicitation is not for CBP to obtain the services of individuals skilled in making presentations.

███████████████████████████████████████████

██████████████████████████████████████

or word limits.  The Government provided ISS with an impermissible and unfair advantage by allowing ISS to exceed the 30-minute time limit.

Second, despite having ample time (the G4S Q&A session taking less than eight minutes of the allotted thirty minutes) the CBP evaluators failed to clarify the issues they had with the G4S responses.  Conversely, the Government evaluators repeatedly interacted with ISS during its Q&A session to clarify answers.  *C.f.* AR 169-171 and AR 235-253.  The difference is starkly demonstrated by the length of the transcripts.  For the Q&A, G4S's presentation totals 3 pages set forth at AR 169-171, and ISS's 18 pages found at AR 235-253.

As provided in the Solicitation, the Q&A session was the opportunity for Government evaluators to "clarify any points addressed which are unclear and may ask for elaboration from the presenters on any topics addressed in the Oral Presentation."  AR at 8.  The Solicitation further provided –

> In order to make the oral presentations as flexible as possible, evaluators are authorized and encouraged to use the question and answer session for a full exchange of information, as needed, to evaluate a specific presentation.

AR at 7.  Unlike its treatment of ISS, and contrary to the Solicitation's evaluation scheme, the evaluators failed to utilize the Q&A session to seek or obtain answers to their outstanding questions and concerns for the G4S quote.  In fact, after each Q&A question the evaluators indicated they were satisfied with the answers by stating – "Good," "satisfied," and stating they have no follow up questions.  *See* AR at 169-171.

The Government's ████████████ regarding G4S all relate to the oral presentation.  Had the Government treated ISS and G4S equally and consistently in accordance with the terms of the RFQ, all the issues could have, and should have, been clarified by the Government evaluators during the 22 minutes remaining in G4S Q&A session (or as in  the case of ISS, allowing extra

████████████████████████████████████████████████████████

████████████████████████████████████████████

time beyond allotted 30 minutes).  *See* AR at 181.  By treating G4S unequally, CBP acted in an

arbitrary and capricious manner and not in accordance with law.

**C.** **THE GOVERNMENT FAILED TO REASONABLY EVALUATE FACTOR ONE DURING PHASE 1 AND THUS OVERLOOKED THE RISK POSED BY ISS AS A POTENTIAL CONTRACTOR.**

The RFQ required CBP Government to evaluate the risk posed by an offeror.  Under Phase

1, CBP was to evaluate Factor One – Experience and Risk Awareness/Mitigation.  *See* AR at 2.

For Phase 1, offerors were required to identify up to three past projects, similar in size and scope

to the work required by the Solicitation utilizing the CEQ, Attachment 2 to the RFQ.  AR at 3, 12.

Corporate experience was limited as follows:

> Vendors may provide up to three (3) reference projects for ongoing projects or projects completed within the last three (3) years of the date of this RFQ demonstrating relevant experience performing projects similar in size, scope, and complexity to this BPA requirement.

AR at 12.

As the prime contractor, ISS was to provide two references for its own work, with one

reference being allowed for a CTA partner.  ISS submitted ████████████████████

████████████████████████████████████  For its first reference, ISS

identified a █████████████████████████████████████████

█████████████████████████████████████████. For its second

reference, █████████████████████████████████████████

█████████████████████████████████████.  On that project, only

█████████████████████████████████████.  As discussed above the

████████████████ does not even ███████████████s.  ISS ████████████████

████████████████████████████████████ and yet CBP allowed

ISS to proceed to Phase 2 of the procurement.  Moreover, the CBP irrationally assigned ██████████

██████████████████████████████████████████████████████████
████████████████████████████████████████████████

█████████████████ to ISS under Factor One, the most important factor, despite its ████████████████████████

████████████ .

The Government awarded a BPA to ISS under which work valued in excess of $277,100,000 is to be placed. The award is approximately ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Simply put, ████████████████████████ were of a similar size, scope, or complexity to the work required by the Solicitation.[17]  Nonetheless, CBP invited ISS to participate in Phase 2 of the procurement.

In determining that it had ██████████████ in ISS's ability to successfully perform the work required by the PWS and passing ISS on to Phase 2 of the procurement, CBP failed to acknowledge or discuss the fact that ISS, the prime contractor, had no experience that met the requirement for similar size, scope, or complexity.  AR at 132.  Likewise, the Government's evaluation failed to acknowledge or address the risk and challenges associated with the ██████████

██████████████████████████████████████████████████████████

████████████ .

CBP failed to rationally evaluate the CEQ submitted by ISS in accordance with the RFQ's requirement for the Phase 1 evaluation.  CBP failed to meaningfully consider or analyze ISS's lack of relevant experience, and its ██████████████████████████ .  Instead of receiving a rating of ████████████████████ under Phase 1, the Government should have taken note of ISS's lack of relevant experience as well as the inherent high risk associated in placing the BPA with a novice like ISS.

---

[17] As discussed in ¶59 of the Pl. Comp., ISS claims to be a small business under various NAICS codes, which would require its 3-year average revenue to be no more than $15 million.

██████████████████████████████████████████████████████████████
███████████████████████████████████████████████

Thus, a reasonable Phase 1 evaluation would have produced a different result, with ISS either being excluded from Phase 2 of the procurement or best case, receiving a Low Confidence rating.

ISS's lack of experience and understanding of the work required by the PWS is further demonstrated by its failure to offer ████████████████████. As discussed above, ISS's price proposal ████████████████████████, and does not take into account the need for ████████████████████. ISS proposed a ████████████████ compared to the number proposed by G4S ████. As the incumbent contractor, G4S has been performing the work for 13 years. *See* AR at 156. Despite the glaring difference between the number of ███████ ██████████████████████████████████ ████████████████, CBP took no notice of the issue. The Government failed to consider why the 13-year incumbent contractor proposed ████████████, while ISS, a company with no similar experience to the size, scope, and complexity of the required work, proposed ██████. There is no documentation in the AR to show whether and how CBP considered the adequacy of a ████████████████, or the impact and risk to the successful performance of the work, and the safety of the detainees, contractor personnel, Government personnel and the general public resulting from understaffing and the ████████████ ███████████████████████.

The cost necessary to perform the work required by the Solicitation is significantly higher than the amount proposed by ISS.[18] ISS's lack of experience likely led it to underestimate the required effort and propose ████████████████, and resulted in a price insufficient to accomplish the work required by the PWS. As discussed above, the Government failed to conduct a reasonable cross-walk of ISS's proposed price to its proposed technical solution, which would have revealed the unacceptable risk posed by ISS's pricing and technical solution. In finding that ISS's proposed

---

[18] As discussed below in §III.F., the IGCE was severely flawed because it failed to account for numerous costs. The IGCE underestimated the cost of performance by ████████████.

████████████████████████████████████████████████████

████████████████████████████

price ████████████████████████, CBP relied upon an IGCE that failed to take into account all the work specified in the PWS.  By our calculations (as detailed below in §III.F), the IGCE should have been more ████████████.  Using that number the ISS price is not just ████████████ ██████████████████████████████  A comparison based on a proper calculation of the IGCE would further illustrate the inability of ISS to perform the required work for the proposed price

In failing to properly assess the risk posed by the ISS proposal, assigning a ███████ ██████████████████ to ISS under Phase 1 and permitting ISS to participate in Phase 2 of the procurement, CBP acted in an arbitrary and capricious manner and not in accordance with law.

**D.    THE GOVERNMENT UNREASONABLY EVALUATED THE G4S ORAL PRESENTATION.**

**1.    The Government unreasonably evaluated G4S for its presentation skills.**

As discussed above, the Government improperly evaluated GRS's use of notes during its oral presentations as an unstated evaluation factor.  AR at 181.  The Solicitation did not preclude, limit, or caution offerors from utilizing notes during the oral presentation, and Contracting Officer Saad specifically authorized the use of notes.

The Solicitation prohibited the use of professional presenters, and specifically required the presenters to include an offeror's proposed program manager, the proposed sector manager, and the proposed transportation officer.  Moreover, CBP is not seeking the services of professional presenters, but is trying to find a contractor that can furnish the services of personnel experienced in providing transportation and security guard services for detainees.

Here, as CBP was well aware, G4S's program manager, sector manager, and transportation officer, are all currently successfully performing the work required by the Solicitation and have numerous years of experience.  It was irrational for the Government evaluators to downgrade G4S

███████████████████████████████████████████████████

████████████████████████████████████

for its presenters reliance upon notes when use of notes was authorized, particularly since CBP knew that the G4S presenters had the knowledge and experience to continue performing the work.

Although portions of the oral presentation's transcript are indecipherable, ████████████ ████████████████████████████████████████ clearly informed the evaluators that they have been performing the incumbent work for ██████████████████, respectively.  AR at 156.  ████████████████████████████ also informed the evaluators that he has been performing the work since ███████████████ *See* Pl. Comp. at ¶43; AR at 156.  The Government should have been less concerned about their presentation skills and more concerned about their actual experience and knowledge.

In downgrading G4S's proposal for the use of notes, the Government ignored what it knew regarding the experience and knowledge of the G4S presenters, acted contrary the terms of the Solicitation and the instructions provided by Contracting Officer Saad, and irrationally focused on presentation skills instead of the ability to perform the work required by the CBP.  Thus, the Government's evaluation of G4S's oral presentation was arbitrary, capricious, and otherwise not in accordance with the terms of the RFQ.

**2.    The Government unreasonably evaluated G4S's responses during the Q&A.**

As part of the Q&A challenge session, the Government asked G4S ████████████████ ██████████████████████████████████████ AR at 169.  The evaluators incorrectly stated that ████████████████████████████████ AR at 181.  In contrast, the transcript shows that G4S presenters stated that ████████████ ██████████████████████████████████████ AR at 170. Furthermore, as discussed in ¶34 of Pl. Comp., the CBP approved G4S standard operating procedures ("SOPs") that deal with the scenario presented by CBP.  G4S's answer is consistent



with the SOPs approved by CBP, which requires ███████████████████████
█████████████████████.

The evaluators also asked G4S how it would ████████████████.  G4S
understood the question to be asking ████████████████████████████████
████████████████  AR at 170.  In fact, G4S provided examples of its actual
process of ████████████, and the evaluators responded that they were satisfied with the
answer.  AR at 170.

G4S was also asked ████████████████████████████████
████████████████████  AR at 170.  G4S responded that for all ████
████████████████████████████████████████████████████████
████████████████████████  AR at 170.  The evaluators did not give
a ████████████████████, and thus the remainder of G4S's response focused upon the ████
████████████ - a concrete issue that could be addressed in detail.  In short, G4S did state ████
████████████████████████████████████████████████████████
████████████████████████████████████.

Although the evaluators repeatedly indicated they were satisfied with G4S's responses and
the Company had the bulk of its time remaining in the Q&A session, the evaluators never asked
for any clarification regarding the issues, which subsequent to the G4S oral presentation, they
concluded had not been answered satisfactorily.  CBP's conduct of G4S's Q&A session, and its
interpretation of G4S's responses, were arbitrary, capricious, and otherwise not in accordance with
law.

E.    THE GOVERNMENT FAILED TO ADEQUATELY DOCUMENT ITS EVALUATION.

Based upon well-established precedent, an agency that fails to document its decisions bears
the risk that there may not be adequate supporting rationale in the record for the GAO to conclude

that the agency's decision was reasonable. *Systems Research & Applications Corp.; Booz Allen Hamilton, Inc.*, B-299818 et al. Sept. 6, 2007, 2008 CPD ¶ 28 at 12. Moreover, this principle applies to cases where an agency elects not to provide relevant documents. *See TriCenturion, Inc.; SafeGuard Services, LLC*, B-406032 et al., Jan. 25, 2012, 2012 CPD ¶ 52 at 13. In this case, CBP has failed to adequately document its evaluation in three areas – (i) oral presentations; (ii) the pricing cross-walk (if one actually occurred); and (iii) ISS's experience as relevant to the Phase 1 evaluation

CBP made an audio recording of the oral presentations, including the Q&A sessions. During this protest process, we learned that recording/transcription software from Otter.ai was utilized to make audio recordings of the oral presentations. That software allows users to record conversations on a cell phone and then the software transcribes the audio file into text. The AR does not include the audio file of the oral presentations. Government counsel has represented that the recordings were made on a personal cell phone belonging to one of the CBP officials attending the oral presentations, and that before leaving the facility where the oral presentations were made, he or she deleted the recordings. Government counsel has also advised that CBP was unable to retrieve a copy of the deleted audio files.

The transcript of G4S's presentation is set forth in sixteen pages set forth at AR 155-171, and ISS's presentation is set forth in fifty-four pages found at AR 199-253. Significant portions of the transcript are unintelligible. Because of the unreliability of the transcripts, they are not a meaningful record of the presentations, including the Q&A.

In addition to the Government's failure to adequately document the presentations, the AR includes no documentation regarding the cross-walk of pricing required by the Solicitation. Although the SSDD indicates the SSEB conducted "a cross-walk of the price with respect to the vendor's technical approach," there is no record of the cross-walk in the AR. As discussed above,

████████████████████████████████████

████████████████████████████

the cross-walk of the ISS proposal is vitally important because of the risk posed by its insufficient staffing. However, there is no meaningful recognition or analysis in the AR of ISS's understaffing and the risk posed thereby.

Furthermore, the AR lacks any discussion or analysis of the Phase 1 evaluation regarding ISS's lack of experience. Neither of the █████████████ referenced in its CEQ are of a similar size, scope, or complexity to the work required by the Solicitation, yet the AR makes no mention of this fact. The AR does not provide any rational basis for the Government's decision to pass ISS on to Phase 2 of the procurement or the Phase 1 █████████████████ for ISS.

The Government's decisions are unsupported by the record because it failed to adequately document the bases for its decisions. Therefore, without a proper foundation, the Government's decisions were arbitrary, capricious, and otherwise not in accordance with law.

## F.    THE GOVERNMENT'S BEST VALUE DETERMINATION IS FLAWED.

In addition to basing its best value decision upon the improper actions discussed above, CBP's best value determination also failed to account for the suspect formulation utilized by the Government in establishing the IGCE that was used in evaluating price reasonableness.

CBP's methodology for calculating the IGCE is set forth at AR 1121 and in Attachment 3 to Tab 28 of the AR. In preparing the IGCE, the Government excluded any cost for surge efforts. The rows of the Excel spreadsheet for surge pricing are blank. Therefore, the IGCE price of ██████████ does not account for surge pricing.

Similarly, the IGCE does not include all the Border Patrol Sectors for which pricing was required under the RFQ. A comparison of the IGCE table at AR 1121 and the table provided offerors at AR 81 shows that Big Bend ("BBT") and El Centro ("ELC") sectors were not included in the IGCE.

Unlike the IGCE, the Government's evaluated price for G4S includes surge pricing and the

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

work required for the Big Bend and El Centro sectors.  In the Price Analysis Report, the

Government's evaluated price for G4S was ████████████.  AR at 274.  As shown in the "BPA

Totals" table at AR 273, G4S's evaluated price is the "Total Extended Value Including Surge."

AR at 273.  The table also shows that the total for G4S's surge pricing is ████████████  Moreover,

adding the Big Bend and El Centro weekly totals for G4S for the base period and option periods

(excluding surge pricing) increases the value of the work required under the PWS by

approximately ██████████.  Combined, that is a total of over ██████████ in work included in the

G4S proposal that is not accounted for in the IGCE.  Taking into account all of the missing work,

the IGCE should have been more is ██████████████

In evaluating G4S's pricing, CBP stated that ██████████████████████████ ████████████ ████████

██████████████████████████████████████████ AR at 274.  However, that is

an apples-to-oranges comparison because G4S's evaluated price includes surge pricing and the

cost for the work in the Big Bend and El Centro sectors, and the IGCE does not.  ██████████████

██████████ in the IGCE and G4S's proposed price is based upon work which will be required under

orders issued under the BPA and that the IGCE failed to take into account.  Instead of a ████████

████████, the G4S price is only ████████████████ a correctly calculated IGCE.[20]

The SSDD incorporated by reference the Price Analysis Report discussed in the foregoing

paragraphs.  AR at 285.  In discussing the "major findings" for G4S, the SSDD references the

pricing comparison information from the Price Analysis Report.  AR at 285-286.  In the "Best

Value Determination and Award Decision" section of the SSDD, the SSA once again references

---

[19]  Presumably through a mathematical error, the Government incorrectly increased the delta between the prices by $1,499.  The difference between G4S's evaluated price of ██████████ and the IGCE of ████████████ is

[20] G4S's proposed price minus the corrected IGCE, divided by the corrected IGCE.

████████████████████████████████

the erroneous ████ difference between G4S's evaluated price and the IGCE multiple times.  AR at 287-288.

The Government's best value determination was based upon numerous errors in the underlying price and technical evaluations.  Because the best value decision is based upon incorrect information and a series of missteps that occurred during the evaluation of quotes, the best value decision itself is arbitrary, capricious, and otherwise not in accordance with law.

## G.    G4S WAS PREJUDICED BY THE GOVERNMENT'S IMPROPER EVALUATIONS AND BEST VALUE DETERMINATION.

Even if a protestor shows errors in the procurement process, it must still show that it was prejudiced by those errors.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005).  To establish prejudice, a protestor must show that "there was a 'substantial chance' it would have received the contract award but for the errors …"  *Id.*

In this case, G4S has been prejudiced by the Government's errors.  G4S was the only offeror that provided information necessary to move from Phase 1 of the evaluation to Phase 2, and offered a technical solution that accounted for staffing needed for successful performance.  As discussed above, ISS did not have the necessary experience to pass the Phase 1 evaluation, and severely understaffed its offer – which is evident in its pricing.  If not for the erroneous and improper proposal evaluations discussed above, G4S would have received the contract award for this procurement.  The correction of any of the Government's errors, as described above, would result in award of the BPA to G4S as the only technically acceptable offeror.

## H.    ALL FACTORS FAVOR PERMANENT INJUNCTIVE RELIEF.

### 1.    Success on the Merits.

For the reasons discussed above, the G4S protest is meritorious.  The Company has demonstrated that CBP's conduct of this procurement was arbitrary, capricious, and not in

██████████████████████████████████████████████████

████████████████████████████████████████████

accordance with applicable law and regulation.

## 2.    G4S will suffer irreparable harm.

In evaluating the issue of irreparable harm, the Court considers whether an adequate remedy exists in the absence of an injunction. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003). The "loss of potential work and profits from a government contract constitutes irreparable harm." *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 194 (2015) (citations omitted). Lost profits are considered irreparable harm because a "plaintiff has no action against the United States for lost profits*." Heritage of Am., LLC, v. United States*, 77 Fed. Cl. 66, 78 (2007). In addition, the Court has held that "lost opportunity to compete in a fair competitive bidding process for a contract" constitutes irreparable harm. *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728,743-44 (2008).

G4S is the incumbent contractor for the work being procured under the Solicitation. As discussed in the attached declaration by ████████████████ Declaration")[21], ██████ of G4S, the Company will suffer significant and irreparable harm if the Government is permitted to move forward with the procurement and transition the work from G4S to ISS. G4S has been performing the work covered by the RFQ for thirteen years. It currently employs approximately ████ people to perform the work. *See* ██████ Declaration, ¶12. The G4S personnel are a skilled workforce, with each person costing approximately ████████ to train and license. *See* ██████ Declaration, ¶13. If G4S ceases to perform the work, it will have to terminate the employment of the ████ employees. *See* ██████ Declaration, ¶12.

As further discussed in the ██████ Declaration, G4S has paid millions of dollars to procure modified buses and vans that meet the Government's requirements, as well as paying

---

[21] The ██████ Declaration was included as Exhibit 4 to the Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction. A copy of the ██████ Declaration is attached hereto as Exhibit 1.

██████████████████████████████████████████████████████████

approximately ███████████ for its subcontractor to customize maintenance facilities to service the buses and vans.  *See* ██████ Declaration, ¶¶14, 15.

If the work is allowed to transition from G4S to ISS, the Company will incur non-recoverable costs of approximately ███████████, for costs to recruit, train, license, and maintain the necessary staff during transition.  *See* ██████ Declaration, ¶21.

The work to be performed under the BPA represents a material portion of the Company's annual revenue and profit.  *See* ██████Declaration, ¶18.  If G4S does not receive an award for the work under the Solicitation, the Company will lose approximately ████████████ in revenue and a significant portion of its annual profit.  *See* ██████Declaration, ¶18.  Moreover, if G4S does not receive the award under the RFQ, it will be excluded from competing for or performing the work for up to five years, which is the anticipated period of performance under the Solicitation.  *See* ██████Declaration, ¶18.

**3.     The harm to G4S outweighs the harm to the Defendants.**

The Government has been procuring transportation and security guard services from G4S for thirteen years.  As discussed above, the pricing proposed by G4S is consistent with the work and staffing requirements of the Solicitation.  Conversely, the pricing proposed by ISS fails to account for the staffing necessary for successful performance and clearly demonstrates the risk associated with an award to a contractor lacking relevant experience in transporting detainees along the Southwest Border.  Thus, the Government will not be harmed by utilizing G4S's services, and would be harmed by accepting the offer submitted by ISS.

The Government does not have the right to establish a BPA and place orders against that BPA in violation of the terms of the Solicitation, as well as applicable law and regulation.  Likewise, ISS has no right to receive such a BPA.  Therefore, the Defendants will suffer no legitimate harm from an injunction that prevents such violations.  Rather, the Government will

███████████████████████████████████████

      ███████████████████████████████

benefit from proper and lawful competition of the services required by the Solicitation.

      **4.**      **Injunctive relief is in the public's interest.**

      There is an overriding public interest in preserving the integrity of the procurement process. *Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). The public interest is "served by ensuring that Government officials follow applicable procurement statues and regulations." *Magnum Opus Techs. v. United States*, 94 Fed. Cl. 512, 551 (2010)(citations omitted). G4S's protest alleges substantial violations of applicable procurement law and regulation.

      In addition, the public interest is served by having an adequately staffed contract for the safety of the detainees, contractor personnel, Government personnel, and the general public. ISS's understaffed technical solution will risk the safety of all involved.

      Based upon the foregoing, the public interest is best served by granting the requested injunctive relief to ensure the proposals are fairly and equally considered in accordance with applicable law and regulation.

## IV.    <u>CONCLUSION</u>

      For the foregoing reasons, G4S respectfully requests that the Court grant its motion for judgment on the administrative record and grant G4S the following relief:

      (1) issue a declaratory judgment that CBP's Phase 1, Phase 2, and pricing evaluations were arbitrary, capricious, an abuse of discretion, and otherwise contrary to applicable law and regulation;

      (2) issue an order requiring the Government to (i) permit G4S to clarify the issues identified by the CBP regarding G4S's Q&A session; (ii) reevaluate quotes in response to the RFQ in accordance with the terms of the RFQ and a corrected IGCE, and (iii) make a new down-

select determination and best value determination after such reevaluations.

(3) issue a permanent injunction to prohibit the CBP from ordering any work under the BPA established with ISS, until the Government has clarified the G4S Q&A session issues, reevaluated quotes in accordance with the terms of the RFQ and a corrected IGCE, and made new down-select and best value determinations after such reevaluations, consistent with the foregoing requested declaratory judgment and order.

(4) award to G4S its fees, costs, interest, and expenses incurred in pursuing this protest; and

(5) such other and further relief as the Court may deem just and proper.

October 15, 2019                  Respectfully submitted,


Gerald H. Werfel (Attorney of Record)
H. Todd Whay
Baker, Cronogue, Tolle & Werfel, LLP
1320 Old Chain Bridge Road, Suite 200
McLean, Virginia 22101
Tel: (202) 448-9677
Fax: (202) 403-3814
ghwerfel@bctwlaw.com

*Counsel of Record for G4S secure Solutions (USA), Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of October 2019, I caused a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD to be filed electronically. This filing was served electronically to all parties by virtue of the court's electronic filing system.


Gerald H. Werfel (Attorney of Record)
Baker, Cronogue, Tolle & Werfel, LLP
1320 Old Chain Bridge Road, Suite 200
McLean, Virginia 22101
Tel: (202) 448-9677
Fax: (202) 403-3814
ghwerfel@bctwlaw.com

*Counsel of Record for G4S secure Solutions (USA), Inc.*

# ATTACHMENT 1

## DECLARATION OF ███████████

I, ███████████, under penalty of perjury, declare the following statements are true and correct:

1. I am a U.S. citizen, and a resident of the State of Florida.

2. I am over the age of eighteen years old.

3. This Declaration is being given in connection with the protest at the Court of Federal Claims by G4S Secure Solutions (USA) Inc. (hereinafter "G4S" or the "Company"), of Solicitation No. 3C19Q0067 (the "Solicitation") issued by the U.S. Department of Homeland Security's Customs and Border Protection (the "Agency," "Government" or "CBP"), and the award to ISS Action, Inc. ("ISS" or "Awardee").

4. The facts in this Declaration are true and correct, and unless indicated otherwise are based upon my direct, personal knowledge.

5. I am the ███████████ G4S.

6. I have worked for the Company for over 20 years.

7. I am familiar with the Solicitation and the proposal submitted by G4S in response to the Solicitation.

8. The Solicitation sought offers to provide ground transportation and security guard services along the southwest border of the United States (the "Work").

9. G4S is the incumbent contractor currently performing the Work.

10. G4S has performed the Work for approximately 13 years.

11. G4S is currently performing the Work under a bridge contract until the Work can be performed by G4S or another company under a contract awarded pursuant to the Solicitation.

12. G4S currently employees approximately ███ personnel to perform the Work. The Company will have to terminate the employment of the personnel if it does not retain the Work by receiving an award under the Solicitation.

13. The G4S personnel currently performing the Work are a skilled workforce. Each of the transportation and detention officers required for the Work cost G4S approximately ███████ to train and license.

14. Due to the bridge contract extending G4S's performance of the work, G4S recently purchased ███ new vans for transportation. Each van is required to be modified to meet the security requirements of the Work. With modifications, each van costs approximately ███████, or approximately a total expenditure by G4S of ███████.

Declaration of ▓▓▓▓▓▓▓
Page No. 2

15. G4S's subcontractor has invested a significant sum in maintenance facilities necessary to keep the vehicles operational. G4S's subcontractor invested approximately ▓▓▓▓▓▓▓ to customize maintenance facilities for the Work. G4S's subcontractor will lose approximately ▓▓▓▓▓▓▓ annually due to the facilities not being utilized by G4S for the Work.

16. ▓▓▓▓▓ personnel perform the maintenance of the buses and vans. The maintenance personnel will be terminated if G4S does not retain the work.

17. To meet the expected start date under the Solicitation, approximately ▓▓▓▓▓▓▓ has been invested in customized buses and vans to perform the Work. Due to the customization of the vehicles, the vehicles are unsuitable for commercial use and cannot be affordably modified for commercial use.

18. The Work represents a material portion of the Company's revenue and annual profit. If G4S does not receive an award for the Work under the Solicitation, the Company will lose approximately ▓▓▓▓▓▓▓ in revenue and a significant portion of its annual profit.

19. If G4S does not retain the Work, it will be required to transition the Work to ISS. Since the inception of the program, the Work has not been transitioned from one company to another company. The transition represents a serious risk for the CBP.

20. To date, the CBP has not identified a definitive transition date of the Work to ISS. The lack of a transition date is believed to be due to the complicated and risky aspects of the transition, including the need for ISS to procure and modify numerous buses and vans for transportation.

21. G4S estimates the non-recoverable costs to the Company to transition the Work to ISS is approximately ▓▓▓▓▓▓▓ which includes costs to recruit, train, license, and maintain the necessary staff during transition.

22. If G4S does not receive the award under the Solicitation, it will be excluded from competing for or performing the Work for at least five years, which is the anticipated period of performance under the Solicitation.

In accordance with the provisions of 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

August 28, 2019
**Date**